Christopher Len (Bar No. 257052)
M. Benjamin Eichenberg (Bar No. 270893)
Nicole C. Sasaki (Bar No. 298736)
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Suite 800
Oakland, California 94612
Telephone: (510) 735-9700
Facsimile: (510) 735-9160
Email: chris@baykeeper.org
Email: ben@baykeeper.org
Email: nicole@baykeeper.org

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>AIR PRODUCTS MANUFACTURING CORPORATION; and AIR PRODUCTS AND CHEMICALS, INC.,<br><br>Defendant. | Civil No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*) |

COMPLAINT

Plaintiff San Francisco Baykeeper ("Baykeeper"), by and through its counsel, alleges as follows:

## INTRODUCTION

1.     This is a third-party enforcement action, brought pursuant to section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or CWA), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendant Air Products Manufacturing Corporation and its parent company, Air Products and Chemicals, Inc. (collectively, "Defendant") arising out of Defendant's operations (fabrication of industrial gasses) located at 1515 Norman Avenue, Santa Clara, California ("Facility").  Since on or before September 9, 2014, Defendant has been discharging and continues to discharge polluted stormwater from the Facility, in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.  Since on or before September 9, 2014, Defendant has also violated the General Industrial Stormwater Permit issued by the State of California, NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ ("Industrial Stormwater Permit").  Baykeeper seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the CWA.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over the parties and this action pursuant to section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

3.     On or about September 9, 2019, Baykeeper provided notice of intent to file suit against Defendant for Defendant's CWA violations ("Notice Letter") to the Administrator of the United States Environmental Protection Agency (EPA); the Regional Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") (collectively, "state and federal agencies"), and Defendant, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A).  A copy of the Notice Letter is attached as Exhibit 1.

4.      More than sixty (60) days have passed since the Notice Letter was mailed to Defendant and the state and federal agencies.  Neither EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Northern District of California pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## INTRADISTRICT ASSIGNMENT

6.      Intradistrict assignment of this matter to the San Jose Division of the Court is appropriate pursuant to Civil Local Rule 3-2(e).  The events or omissions which give rise to Baykeeper's claims occurred in Santa Clara County, which is under the jurisdiction of the San Jose Division of the Northern District of California.

## PARTIES

7.      Plaintiff Baykeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Oakland, California.  Baykeeper's approximately 1,500 members live and/or recreate in and around the San Francisco Bay area.  Baykeeper's mission is to protect San Francisco Bay from the biggest threats and hold polluters accountable.  Baykeeper is dedicated to protecting the water quality of San Francisco Bay for the benefit of its ecosystems and communities.  To further these goals, Baykeeper actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.      Members of Baykeeper, including citizens, taxpayers, property owners, and residents, live, work, and travel near, and recreate in, San Francisco Bay and its tributaries, into which Defendant discharges pollutants.  Baykeeper members use and enjoy San Francisco Bay and its tributaries for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes.  Defendant's discharges of stormwater containing pollutants impair each of these uses and thus harms Baykeeper and its members.  Thus, the interests of Baykeeper's members have been, are being, and will continue

to be adversely affected by Defendant's failure to comply with the CWA and the Industrial Stormwater Permit.

9.      Baykeeper brings this action on behalf of its members, many of whom regularly enjoy San Francisco Bay and/or seek to protect its waters and the wildlife inhabiting San Francisco Bay and adjacent areas.  Defendant's continuing failure to comply with the Clean Water Act and federal laws and regulations relating to the protection of waters of the United States has harmed, and will continue to directly and substantially harm, the interests of Baykeeper's members', hundreds of species of wildlife, and residents of the Bay Area.  A decree declaring Defendant to have violated the Clean Water Act, and granting the various other remedies sought herein, will redress Baykeeper's harms.

10.     Baykeeper has one or more members who use, explore, and recreate in areas impacted by the stormwater pollution herein at issue and could sue in their own right.  Some of Baykeeper's members will suffer recreational, aesthetic, or other environmental injuries due to Defendant's pollution.  Baykeeper's members use and enjoy San Francisco Bay for recreational, scientific, and aesthetic purposes and would reasonably cease these activities should San Francisco Bay's water quality become too degraded.  Baykeeper's injuries-in-fact are fairly traceable to Defendant's conduct and would be redressed by the requested relief.

11.     Neither the claims brought by Baykeeper nor the relief Baykeeper requests requires the participation of individual members.

12.     Defendant is an active California corporation, registered since July 27, 1961.  The June 1, 2015 "Notice of Intent" for the Facility to comply with the terms of the Industrial Stormwater Permit and each annual report filed for the Facility since 2015 pursuant to the Industrial Stormwater Permit named Air Products and Chemicals as the operator and owner.  Plaintiff is therefore informed and believes and thereon alleges that Defendant operates the Facility.

## REGULATORY BACKGROUND

### The Problem of Stormwater Pollution

13.     Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of San Francisco Bay.  With every rainfall event, hundreds of millions of gallons of polluted

rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and the Bay. The Regional Board has stated that stormwater pollution is the largest source of pollution entering San Francisco Bay and Bay area surface waters each year.

14.     Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life. In particular, stormwater can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate and nitrite. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects. Heavy metals have been shown to alter activity in tissues and blood of fish.

15.     High concentrations of total suspended solids (TSS) degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS have been shown to alter predator-prey relationships (for example, turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons (PAHs), are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

**The Clean Water Act**

16.     CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with the specific requirements of the CWA. Among other things, CWA section 301(a) prohibits discharges not authorized by or in violation of the terms of a National Pollutant Discharge Elimination System (NPDES) permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

17.     CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges. In California, EPA has approved the State Board and its nine Regional Boards to administer an NPDES permit program for the State. The State Board and

Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

18. CWA section 402(p), 33 U.S.C. § 1342(p), requires that NPDES permits be issued for stormwater discharges "associated with industrial activity."

19. CWA section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology (BCT) for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

20. CWA section 505(a)(1) provides for third-party enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

21. CWA section 505(a) authorizes third-party enforcement actions for injunctive relief. 33 U.S.C. § 1365(a).

22. CWA violators are subject to an assessment of civil penalties of up to $37,500 per day per violation for violations occurring between January 12, 2009 and November 2, 2015, and up to $54,833 per day per violation for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. §§ 19.1-19.4.

**Water Quality Standards**

23. Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

24. The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan which contains Water Quality Standards for water bodies within its geographic area.

25.     The San Francisco Bay Regional Water Quality Control Board has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, which sets forth the Water Quality Standards and beneficial uses for San Francisco Bay and its tributaries.

26.     The Basin Plan sets forth, among other things, narrative Water Quality Standards for floating material, oil and grease, sediment, settleable matter, and suspended materials.  *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-4.

27.     In addition, EPA has promulgated Water Quality Standards for toxic priority pollutants in all California water bodies (the "California Toxics Rule" or "CTR"), which apply to San Francisco Bay and its tributaries, unless expressly superseded by the Basin Plan.  65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

### The Industrial Stormwater Permit

28.     In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity.  On April 17, 1997, the State Board adopted the 1997 Permit, which was in effect through June 30, 2015.  On July 1, 2015, the most recent version of the Industrial Stormwater Permit ("2015 Permit") became effective.[1]

29.     To discharge stormwater lawfully in California, industrial dischargers (i.e., facility operators) must secure coverage under the Industrial Stormwater Permit by filing a notice of intent, and comply with its terms, or obtain and comply with an individual NPDES permit.  2015 Permit, Section I(A) (Findings 8, 12, 17), Attachment C (defining "discharger").

30.     The Industrial Stormwater Permit is an NPDES permit issued pursuant to CWA section 402(p), 33 U.S.C. § 1342(p).  Violations of the Industrial Stormwater Permit are also violations of the CWA.  2015 Permit, Section XXI(A).

31.     The Industrial Stormwater Permit's Discharge Prohibitions also prohibit stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.  *Id*. at Sections III(C), VI(C).

---

[1] Where violations of the 2015 permit are alleged, such violations are also presumed to violate equivalent provisions of the 1997 Permit, where applicable.

32.     The Industrial Stormwater Permit includes Receiving Water Limitations that prohibit discharges that adversely impact human health or the environment. *Id*. at Section VI(B).

33.     The Industrial Stormwater Permit's Receiving Water Limitations also prohibit discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id*. at Section VI(A).

34.     Under the CWA and the Industrial Stormwater Permit, dischargers must meet Effluent Limitations that require dischargers to employ Best Management Practices (BMPs) that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); 2015 Permit, Section X(H).

35.     EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

36.     According to EPA's Industrial Stormwater Fact Sheet for Sector AA, polluted discharges from fabricated metal products and manufacturing facilities, such as the Facility, contain chemical oxygen demand (COD), TSS, oil and grease, aluminum, copper, iron, lead, and zinc. The 2015 Permit recommends these "[i]ndicator parameters" be used to aid compliance evaluations; "[f]or example, [COD] concentrations can indicate the presence of dissolved organic compounds, like residual food from collected recycling materials." 2015 Permit, Fact Sheet Section II(J)(3)(b).

37.     The 2015 Permit includes Numeric Action Limits (NALs) that are based on EPA's Benchmarks. *Id*. at Section I(M) (Finding 62). The NALs do not strictly represent technology-based effluent limitations. *Id.* at Section I(M) (Finding 63). However, they do indicate "the overall pollutant control performance at any given facility." *Id.* at Section I(M) (Finding 61).

38.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan (SWPPP) at the time industrial activities begin. *Id.* at Sections I(I) (Finding 54), X(B). The SWPPP

must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. *Id.* at Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. *Id.* at Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.* at Sections I(D) (Finding 32), V(A).

39.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.* at Section X.

40.     The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times. *Id.* at Section XXI(F).

41.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id.* at Sections I(J) (Finding 55), X(B)(1).

42.     The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. *Id.* at Sections I(J) (Findings 55-56); XI.

43.     Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater

discharges and record responsive measures taken to eliminate unauthorized non-stormwater discharges and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges. *Id*. at Section XI(A).

44. Facility operators must collect and analyze samples of stormwater discharges from two qualifying storm events (QSEs) within the first half of each reporting year (July 1 to December 31), and two QSEs within the second half of each reporting year (January 1 to June 30). *Id*. at Section XI(B)(2).

45. Facility operators must collect samples of stormwater discharges from all locations where stormwater may be discharged from the facility. *Id*. at Section XI(B)(4)-(5).

46. The 2015 Permit requires facility operators to sample for TSS, oil and grease, and pH; parameters associated with the facility's industrial operations; parameters identified in Table 1 of the 2015 Permit based on the facility's standard industrial classification (SIC) code; and applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. at Section XI(B)(6)(a)-(e).

47. The 2015 Permit requires operators of facilities that fall under SIC Code 2813, such as the Facility, to analyze stormwater samples for iron, aluminum, and nitrate + nitrite nitrogen (N+N). *Id*. at Table 1.

**The 2015 Permit Exceedance Response Actions Requirements**

48. The 2015 Permit requires dischargers to complete certain Exceedance Response Actions (ERAs) based on stormwater sampling results in order to assist dischargers in complying with the 2015 Permit. *Id*. at Section I(M) (Finding 64).

49. When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." *See id*. at Section XII(B).

50. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an exceedance of an annual average or instantaneous NAL for that parameter. *Id*. at Section XII(C).

51. Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See id*. at Section XII(C). By October 1 following commencement of Level 1

status, permittees are required to "complete an evaluation, with the assistance of a [Qualified Industrial Stormwater Practitioner (QISP)], of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the [2015] Permit." *See id.* at Section XII(C)(1)(a)-(c).

52.     Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via the State Board's Stormwater Multiple Application and Report Tracking System (SMARTS) database a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See id.* at Section XII(C)(2)(a)(i)-(ii).

53.     A discharger in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See id.* at Section XII(C)(2)(a)(iii).

54.     A discharger in Level 1 status for a parameter will return to Baseline status once the discharger has completed the Level 1 ERA Report and implemented all identified additional BMPs, and results from four consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See id.* at Section XII(C)(2)(b).

55.     A discharger in Level 1 status for any parameter changes to Level 2 status on July 1 following the reporting year in which the NAL exceedance(s) occurred for that same parameter. *See id.* at Section XII(D). By January 1 following commencement of Level 2 status, the discharger is required to submit via SMARTS a Level 2 ERA Action Plan to address NAL exceedance(s) in the drainage areas where the NAL exceedances occurred. *See id.* at Section XII(D)(1)(a)-(e). The Level 2 ERA Action Plan must include a schedule and detailed description of the tasks required to complete the discharger's selected demonstration(s). *Id.* The discharger is required to submit via SMARTS a Level 2 ERA Technical Report by January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan. *See id.* at Section XII(D)(2)(a)-(c).

## STATEMENT OF FACTS

### The Facility's Operations and Stormwater Discharges

56.     Defendant operates the Facility located at 1515 Norman Avenue in Santa Clara, California.

57.     The Facility discharges stormwater into the Guadalupe River, which discharges into South San Francisco Bay.

58.     San Francisco Bay and its tributaries, including the Guadalupe River and South San Francisco Bay, are waters of the United States.

59.     The Facility is regulated by the Industrial Stormwater Permit.

60.     Defendant submitted a Notice of Intent to comply with the 2015 Permit to the State Board on or around June 15, 2015.

61.     Operations at the Facility generally consist of, but are not limited to, manufacture and supply of industrial gases, chemicals, and technology.

62.     Defendant has self-identified the Facility as falling under SIC code 2813.

63.     Some operations at the Facility are causing pollutants to be exposed to rainfall.

64.     Pollutants generated at the Facility are exposed to stormwater flows.

65.     Activities at the Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Facility.  During rain events, this pollution washes off of those surfaces and into stormwater discharge points, which flow to the Guadalupe River and South San Francisco Bay.

66.     The types of pollutants that the Facility releases into the immediate environment are known to include or have the potential to include TSS, oil and grease, iron, aluminum, N+N, refrigerant, organic and inorganic chemicals, synthetic pollutants, diesel fuel, synthetic organics, and other pollutants.

67.     Defendant's sampling results since September 9, 2014 indicate that the Facility's stormwater discharges have consistently exceeded Benchmarks for TSS, iron, aluminum, and N+N.

68.     Defendant's sampling results indicate that the Facility's discharges are causing or threatening to cause pollution, contamination, and/or nuisance; adversely impact human health or the

environment; and violate applicable numeric Water Quality Standards and applicable narrative Water Quality Standards.

69.     Neither Defendant's past nor current SWPPPs include adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels.

70.     Defendant's SWPPP fails to include the information required by the Industrial Stormwater Permit.

**Defendant's Exceedance Response Actions Reports**

71.     Based on self-reported data from stormwater samples, as of July 1, 2016, Defendant was in Level 1 status for aluminum, iron, and N+N based on NAL exceedances during the 2015-2016 reporting period.

72.     The annual average for iron during the 2015-2016 reporting period was 3.927 mg/L, approximately four times the NAL.  The annual average for aluminum during the 2015-2016 reporting period was 2.866 mg/L, more than three times the NAL.  The annual average for N+N during the 2015-2016 reporting period was 3.039, over four times the NAL.

73.     Defendant's Level 1 status evaluation and Level 1 status ERA Report for N+N, prepared in December 2016, identified additional/improved BMPs to be implemented at the Facility.

74.     However, though required to be submitted by January 1, 2017 (2015 Permit, Section XII.C.2.a.), no Level 1 ERA Evaluation/Report was submitted for iron or aluminum, and Defendant failed to identify additional BMPs "necessary to prevent future NAL exceedances at the Facility and to comply with the requirements of [the 2015 Permit]," as evidenced by the fact that sampling results from the 2016-2017 reporting period showed continued and increased exceedances of aluminum and iron.  *See* 2015 Permit, Section XII.C.1.c, XII.C.2.a.ii.

75.     Based on self-reported data from stormwater samples, as of July 1, 2017 Defendant was in Level 1 status for TSS based on NAL exceedances during the 2016-2017 reporting period.

76.     The annual average for TSS during the 2016-2017 reporting period was 121.733 mg/L, over the NAL.

77.     Defendant's Level 1 status evaluation and Level 1 status ERA Report for TSS, prepared in December 2016, identified additional/improved BMPs to be implemented at the Facility.

78.     However, Defendant failed to identify additional BMPs "necessary to prevent future NAL exceedances at the Facility and to comply with the requirements of [the 2015 Permit]," as evidenced by the fact that sampling results from the 2017-2018 reporting period showed continued and increased exceedances of TSS.  *See* 2015 Permit, Section XII.C.1.c, XII.C.2.a.ii.

79.     Based on self-reported data from stormwater samples, as of July 1, 2017, Defendant was in Level 2 status for aluminum, iron, and N+N based on NAL exceedances during the 2016-2017 reporting period.

80.     The annual average for aluminum during the 2016-2017 reporting period was 4.639 mg/L, more than six times the NAL, the annual average for iron during the 2016-2017 reporting period was 7.607 mg/L, seven and a half times the NAL, and the annual average for N+N during the 2016-2017 reporting period was 5.141 mg/L, also seven and a half times the NAL.

81.     Defendant's Level 2 status ERA Action Plan for aluminum, iron, and N+N submitted on SMARTS in December 2017, recommended additional BMPs.

82.     However, the BMPs identified in Defendant's Level 2 status ERA Action Plan were insufficient to achieve the effluent limitations in the Industrial Stormwater Permit and, in fact, did not achieve adequate reductions in pollutant concentrations in the Facility's stormwater discharges.  *See* 2015 Permit, Section XII(D).

83.     The annual average for aluminum during the 2017-2018 reporting period was 4.517 mg/L, more than six times the NAL, the annual average for iron during the 2017-2018 reporting period was 5.032 mg/L, five times the NAL, and the annual average for N+N during the 2017-2018 reporting period was 7.015 mg/L, ten times the NAL.

84.     Based on self-reported data from stormwater samples, as of July 1, 2018, Defendant was in Level 2 status for TSS based on NAL exceedances during the 2017-2018 reporting period.

85.     The annual average for TSS during the 2017-2018 reporting period was 131 mg/L, above the NAL.

86.     Defendant's Level 2 status ERA Action Plan for TSS, submitted on SMARTS in June 2019, half a year late, recommended one additional BMP.

87.     The BMPs identified in Defendant's Level 2 status ERA Action Plan was insufficient to

achieve the effluent limitations in the Industrial Stormwater Permit and, in fact, did not achieve adequate reductions in pollutant concentrations in the Facility's stormwater discharges. *See* 2015 Permit, Section XII(D).

88. Based on self-reported data from stormwater samples, and as of July 1, 2019, Defendant remained in Level 2 status for aluminum, iron, N+N, and TSS based on NAL exceedances during the 2018-2019 reporting period.

89. The annual average for aluminum during the 2018-2019 reporting period was 5.641 mg/L, more than six times the NAL; the annual average for iron during the 2018-2019 reporting period was 7.492 mg/L, seven and a half times the NAL; the annual average for N+N during the 2018-2019 reporting period was 1.715 mg/L, two and a half times the NAL; and the annual average for TSS during the 2017-2018 reporting period was 135.636 mg/L, above the NAL.

90. Defendant's Level 2 Technical Report for Aluminum, Iron, and N+N, submitted on SMARTS in June 2019, again six months late, recommended one additional BMP.

91. Defendant failed to identify additional BMPs "necessary to prevent future NAL exceedances at the Facility and to comply with the requirements of [the 2015 Permit]." *See* 2015 Permit, Section XII.C.1.c, XII.C.2.a.ii. The selected advanced BMP in Defendant's Level 2 ERA Technical Report fails to specify an implementation schedule, as required by the 2015 Permit. Section XII.D.1.e.

## Activities Contributing to CWA Violations

92. Defendant has not developed and/or implemented an adequate SWPPP at the Facility.

93. Defendant has not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facility.

94. Defendant has not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility.

95. Defendant has not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

96. Defendant has not developed and/or implemented adequate measures to reduce or eliminate stormwater pollution that constitute BAT/BCT.

97.     Defendant has not developed and/or implemented adequate BMPs at the Facility to achieve stormwater discharges that meet Benchmarks, NALs, and/or applicable Water Quality Standards.

98.     Defendant has not adequately evaluated and revised the Facility's SWPPP to address these failures.

99.     Defendant has failed to properly operate and maintain the structures and systems that have been put in place at the Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

100.    Defendant has not developed and/or implemented an adequate monitoring and reporting program at the Facility.

101.    Defendant's monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facility.

102.    Defendant's monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revisions of the SWPPP.

103.    Due to Defendant's lack of effective pollution prevention measures, including effective BMPs, and their failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents.  Pollutants become entrained in stormwater when such water flows over and across the outdoor areas of the Facility.

104.    Defendant's annual stormwater sampling results indicate that the Facility's discharges of stormwater are consistently contaminated with higher levels of pollutants than are permissible under the Industrial Stormwater Permit and the CWA.

105.    Defendant's annual stormwater sampling results indicate that the Facility's discharges of stormwater are regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT.

106.    Defendant's repeated stormwater exceedances of Benchmarks since October 1, 2015 for pollutants, including TSS, iron, aluminum, and N+N, indicate that Defendant has failed and continues to fail to meet BAT/BCT and applicable Water Quality Standards.

107.    Defendant has not developed and/or implemented an adequate Level 1 status evaluation

and Level 1 ERA Report at the Facility for aluminum, iron, N+N, or TSS.

108.  Defendant has not developed and/or implemented an adequate Level 2 status ERA Action Plan at the Facility for aluminum, iron, N+N, or TSS.

109.  Defendant has not developed and/or implemented an adequate Level 2 ERA Technical Report at the Facility for aluminum, iron, or N+N.

## CLAIMS

## FIRST CLAIM FOR RELIEF

**Discharges in Excess of Effluent Limitations in Violation of the Industrial Stormwater Permit and the Clean Water Act**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

110.  Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

111.  The CWA and the Industrial Stormwater Permit include effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of BAT for toxic pollutants and BCT for conventional pollutants.

112.  Defendant has discharged and continues to discharge stormwater from the Facility containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain) occurring from September 9, 2014 through the present. *See* Exhibit 1, Notice Letter at Attachment 3. Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Industrial Stormwater Permit and the CWA. *See* 2015 Permit, Sections I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b).

113.  Each day, since at least September 9, 2014, that Defendant has discharged stormwater from the Facility containing pollutants in excess of BAT/BCT requirements is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

114.  Defendant's CWA violations described in the paragraphs above will continue in the future, as violations of Sections I(D) and V(A) of the 2015 Permit, until Defendant develops and implements BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via

BAT and BCT.

115.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

116.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

117.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

<u>SECOND CLAIM FOR RELIEF</u>

**Discharges in Excess of Discharge Prohibitions and Receiving Water Limitations in Violation of the Industrial Stormwater Permit and the Clean Water Act**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

118.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

119.    Discharge Prohibitions of the Industrial Stormwater Permit prohibit stormwater discharges from causing or threatening to cause pollution, contamination, or nuisance.  *See* 2015 Permit, Sections III(C), VI(C).

120.    Receiving Water Limitations of the Industrial Stormwater Permit require that stormwater discharges and authorized non-stormwater discharges shall not adversely impact human health or the environment.  *See Id*. at Section VI(B).

121.    Finally, Receiving Water Limitations of the Industrial Stormwater Permit prohibit discharges that cause or contribute to a violation of any water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.  *Id*. at Section VI(A).

122.    Since at least September 9, 2014, Defendant has been discharging polluted stormwater from the Facility in violation of the Discharge Prohibitions and Receiving Water Limitations of the

Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain). *See* Exhibit 1, Notice Letter at Attachment 3.

123.    The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of Section VI(B) of the 2015 Permit.

124.    Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of Sections III(C) and VI(C) of the 2015 Permit.

125.    Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause or contribute to violations of the Water Quality Standards set forth in the Basin Plan in violation of Section VI(A) of the 2015 Permit.

126.    Each day, since at least September 9, 2014, that Defendant has discharged polluted stormwater from the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

127.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

128.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

129.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### THIRD CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan
in Violation of the Industrial Stormwater Permit**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

130.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

131.    The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP when they commence industrial activity.  2015 Permit, Section X(B).

132.    Defendant, as of September 9, 2014, has commenced industrial activity and continues to conduct industrial activity at the Facility.

133.    Defendant has failed and continues to fail to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by the Industrial Stormwater Permit.

134.    Defendant has failed and continues to fail to develop or implement a SWPPP for the Facility that includes BMPs adequate to meet the requirements of the Industrial Stormwater Permit, specifically, Section X of the 2015 Permit.

135.    Defendant has failed and continues to fail to adequately develop or implement a SWPPP at the Facility that prevents discharges from violating the Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations of the Industrial Stormwater Permit.

136.    Each day since September 9, 2014 that Defendant has failed to adequately develop and/or implement a SWPPP for the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

137.    Defendant has been in violation of the Industrial Stormwater Permit's SWPPP requirements every day since September 9, 2014.  Defendant will continue to be in violation of the SWPPP requirements each day that Defendant fails to develop and fully implement an adequate SWPPP for the Facility.

138.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

139.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm

Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

140.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

**Failure to Submit Adequate ERA Reports in Violation of the Industrial Stormwater Permit and the Clean Water Act**

**33  U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

141.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

142.    Plaintiff is informed and believes, and thereon alleges, that Defendant has conducted inadequate Level 1 status evaluations and submitted inadequate Level 1 ERA Reports for aluminum, iron, N+N, and TSS.

143.    Plaintiff is informed and believes, and thereon alleges, that Defendant has submitted inadequate Level 2 status ERA Action Plans for aluminum, iron, N+N, and TSS.

144.    Plaintiff is informed and believes, and thereon alleges, that Defendant has conducted inadequate Level 2 ERA Technical Reports for aluminum, iron, and N+N.

145.    Defendant's violations of the Level 1 status ERA requirements of the 2015 Permit and the CWA are ongoing and continuous.

146.    Defendant's violations of the Level 2 status ERA requirements of the 2015 Permit and the CWA are ongoing and continuous.

147.    Every day Defendant conducts operations at the Facility without an adequate Level 1 status evaluation, an adequate Level 1 ERA Report, an adequate Level 2 status ERA Action Plan, and/or an adequate Level 2 ERA Technical Report is a separate and distinct violation of the 2015 Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

148.    Defendant has been in daily and continuous violation of the 2015 Permit Level 1 status ERA requirements every day since at least January 1, 2017.

149.    Defendant has been in daily and continuous violation of the 2015 Permit Level 2 status

ERA requirements every day since at least January 1, 2018.

150.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 1, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

151.     An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA.  33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and Plaintiff's members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

152.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

## RELIEF REQUESTED

Baykeeper respectfully requests this Court to grant the following relief:

1.     Declare Defendant to have violated and to be in violation of sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the Industrial Stormwater Permit;

2.     Enjoin Defendant from discharging pollutants from the Facility to stormwater discharge points, which discharge to South San Francisco Bay;

3.     Order Defendant to restore all receiving waters damaged by Defendant's illegal discharges of pollutants from the Facility;

4.     Enjoin Defendant from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

5.     Order Defendant to pay civil penalties for each violation of the CWA at $37,500.00 per

day per violation for all CWA violations between September 9, 2014 and November 1, 2015, and $54,833.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

6.     Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA section 505(d), 33 U.S.C. § 1365(d); and

7.     Award such other relief as this Court may deem appropriate.


Dated:  November 14, 2019                    Respectfully Submitted,

SAN FRANCISCO BAYKEEPER

/s/ M. Benjamin Eichenberg
_____
M. Benjamin Eichenberg

Attorney for Plaintiff